FILED

12/22/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 4, 2020

**STATE OF TENNEESSEE v. CHRISTOPHER RYAN SIMMONS**

**Appeal from the Circuit Court for Lincoln County**
**No. 2018-CR-35      Forest A. Durard, Jr., Judge**

_____

**No. M2019-00786-CCA-R3-CD**

_____

The Lincoln County Grand Jury indicted Defendant, Christopher Ryan Simmons, for aggravated burglary in count one; vandalism less than $1,000 in count two; theft of property valued between $2,500 and $10,000 in counts three and four; evading arrest by motor vehicle in count five; and evading arrest on foot in count six. Following a trial, the jury convicted Defendant on all counts as charged. On appeal, Defendant argues that the trial court erred by denying his motion for judgment of acquittal, asserting that the evidence was insufficient to establish his identity as the perpetrator of the offenses. Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Jeffrey E. Schofill, Tullahoma, Tennessee, for the appellant, Christopher Ryan Simmons.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Robert J. Carter, District Attorney General; and Ann Filer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural History**

Donna Newgent, the victim, testified that she lived on a country road with just "chicken houses and woods, fields." The victim lived in a one-story home with an attached garage. She said that her garage door was not automatic and that her garage also

had a pedestrian door with a lock on the doorknob. The victim said that she did not use the front door to her house because she used the area for storing boxes and a rocking chair. The victim stated that she had a mixed Labrador dog that would bark at deer, possums, and squirrels in her yard and whenever a car pulled into her driveway.

The victim stated that she was home alone on the night of November 21, 2017, to the morning of November 22, 2017. She said that she locked all the doors to her home before bed. While she was in bed, she heard "maybe footsteps, no voices or nothing like that, just a noise" outside her home. The victim's dog was barking. She called her daughter, Augusta Whitehead, and asked her son-in-law, Shane Whitehead, to come over. The Whiteheads lived about half a mile from the victim. While the victim was on the phone with Ms. Whitehead, she heard someone attempting to enter through the front door. The victim went to the bathroom and locked herself inside, and then Mr. Whitehead called her from outside her home. Mr. Whitehead told her that he was inside the house and asked her to come out of the bathroom and to turn on every light while she walked through the house until she reached him. The victim and Mr. Whitehead did not find anyone inside or outside the house.

The victim saw that her garage doors and her front door were open. Mr. Whitehead noted that the victim's tools from her garage were "out in the yard," so he told Ms. Whitehead and the victim to call 911. Once Lincoln County Sheriff's Department ("LCSD") deputies arrived, the victim and Mr. Whitehead provided what information they had. Later, the victim also spoke with Sergeant Nathan Massey. She made a list of the items that were stolen from her home and car and estimated the value of the items to be $2,700. Additionally, she estimated the value of the labor to repair damage done to her doors to be $750.

The victim testified that Defendant was her "kin" because she was first cousins with Defendant's mother. The victim said that she never socialized with Defendant or his mother. The victim said that Defendant's grandmother, Jean Ward, lived less than half a mile from her home.

On cross-examination, the victim stated that she never saw Defendant in or around her house. She never saw Defendant drive by her house in a van that evening.

Shane Whitehead testified that he was married to the victim's daughter and that Ms. Ward lived between him and the victim on the same road. In the early morning of November 22, 2017, Ms. Whitehead received a phone call from the victim concerning a possible break in. Mr. Whitehead "grabbed [his] keys and gun and flashlight" and went to the victim's home. When he arrived at the victim's house, he noticed tools and an air compressor in the yard and that the garage door was open. He did not see anyone outside

the home or inside the garage. Mr. Whitehead called the victim, and she told him she thought someone was trying to enter the front door. Mr. Whitehead left the garage and went to the front door where he found a crowbar next to the door and the door handle broken off. The screen door was "cracked open." He said that the front screen door was "nailed shut," so "the only way it could be opened was by something prying it open."

Mr. Whitehead "shoved" himself into the front door and called out "very loud[ly]" to anyone inside the house to leave. No one responded. Mr. Whitehead said that he told the victim to come to him in the front room and to turn on every light in the house on her way. He told the victim to call 911 as he searched the rest of the house, but he never saw anyone else inside.

On cross-examination, Mr. Whitehead testified that, when he first approached the victim's front door, he saw a debit card lying on the ground. He stated that the deputies told him the debit card belonged to "Justin Shockley." He said that he did not see a white van or Defendant driving a white van on the night of the offense.

LCSD Deputy Jonathan Jones testified that, in the early morning of November 22, 2017, he received a call from dispatch that there was a burglary in progress on Hotel Road. When he and other deputies arrived, they noticed that some tools were on the lawn next to the driveway. The deputies could not enter through the front door, so they came in through the garage and "cleared" the garage and the house to ensure that no one was inside. Deputy Jones said that they "made sure [the victim] was okay[.]" The deputies got witness statements from the victim and Mr. Whitehead. The deputies found a debit card and a crowbar near the front door. Deputy Jones said that, on the front door, "there was damage where you could tell maybe looked like somebody tried to jimmy the door with a card or with a crowbar."

Deputy Jones testified that they heard a "vehicle coming back up the road" driving at a "slow rate of speed." He said that it was "a silver minivan" with the windows rolled down. Deputy Jones stated that deputies stepped into the road and tried to stop the van when it was in front of the victim's house. The driver of the van was a white, bald male with a small-to-medium build. The driver of the van "stuck his head out [of] the window and [] asked who [Deputy Jones] was[.]" Deputy Jones answered the driver, and the driver "yelled some profanities . . . and took off speeding[,] . . . spinning tires and throwing gravel back" in the direction of the deputies. Deputy Jones and Deputy Justin Gault ran to their patrol cars and pursued the van with their blue lights flashing and with sirens on. The van turned its lights off, but the deputies could see the back of the van in the distance. Following a pursuit, the van went through a stop sign, "hit the fence," and went "into the ditch." The deputies approached the van and saw that the driver's door was open but that no one was inside the van.

Deputy Jones testified that they radioed for a K-9 unit to help track down the driver of the van. Deputy Brian McCrory arrived with a dog named Bruno, and Deputy McCrory and Deputy Gault left the scene of the accident to track the driver. Sergeant Massey arrived and "processed" the van, taking pictures and collecting evidence.

LCSD Deputy Justin Gault testified that, in the early morning of November 22, 2017, he heard a call from dispatch over Deputy Jones's radio regarding a burglary in progress. Deputy Gault proceeded to the scene as backup for Deputy Jones. When the deputies arrived, Deputy Gault noticed "a bunch of items laid out on the edge of the field, right on the edge of the field in the yard." The deputies "cleared" the house and made contact with the victim and Mr. Whitehead. Deputy Gault noticed a crowbar and a debit card near the front door.

Deputy Gault stated that he noticed a vehicle "coming up the road" and that the deputies "walked out toward the road toward the [vehicle. A]s it came closer it was going at a very slow speed." Deputy Gault said that the deputies tried "flagging the person down" and that the driver of the vehicle asked who they were. After Deputy Jones told the driver that they were from LCSD, the driver yelled "f*ck you" and "spun the tires." Deputy Gault testified that he and Deputy Jones ran to their vehicles to pursue the van. He stated that the van turned off its headlights during the pursuit. Deputy Gault explained that he saw the van's brake lights ahead, so the deputies followed. The deputies found the van "in the ditch."

Deputy Gault recalled that the deputies approached the van and that the driver's side door was open. There was no one in the van but there were "a few bags . . . with tools in them." The deputies called for Deputy McCrory with the K-9 unit, and Deputy Gault joined him on the search for the driver for about thirty to forty-five minutes. The driver was never located. Sergeant Massey arrived and "processed" the van.

Franklin County Sheriff's Department Deputy Colton Clark testified that, in the early morning of November 22, 2017, he was dispatched to take a report of a stolen vehicle. He said that Michelle Simmons, Defendant's wife, had called 911 to report her white Kia Sedona was stolen. Deputy Clark stated that Ms. Simmons reported that "a Mr. Shockley came by the house at approximately 11:30" the night before. Ms. Simmons told Deputy Clark that, the next morning, she noticed her van was missing from her driveway. Ms. Simmons reported that Defendant was in Dickson, Tennessee, at the time, doing "mechanic work" with a family member. Ms. Simmons gave Deputy Clark a man's wallet with an identification card inside belonging to Justin Shockley.

While Deputy Clark was speaking with Ms. Simmons, he received communication that "there was a situation" in Lincoln County with Ms. Simmons' van. Deputy Clark

contacted Sergeant Massey and relayed Ms. Simmons' report. Sergeant Massey arrived at Ms. Simmons' house and received consent to search for Defendant. Deputy Clark testified that he and Sergeant Massey found Defendant inside the house in a bedroom closet. Sergeant Massey advised Defendant of his *Miranda* rights, and Defendant was taken into custody. Deputy Clark testified that Defendant waived his rights and agreed to speak to law enforcement.

Deputy Clark stated that Defendant admitted to taking his wife's van, to burglarizing the victim's home with Justin Shockley, to fleeing law enforcement and wrecking his wife's van, and to "running home on foot" and hiding in the closet. Defendant told Deputy Clark that the cut on his head was due to his employment as a "logger." Deputy Clark advised Ms. Simmons that making a false report of a stolen vehicle was a crime. Ms. Simmons admitted to lying to Deputy Clark and to making the false report at the direction of Defendant.

On cross-examination, Deputy Clark testified that he did not recall whether Defendant was under the influence when he arrested Defendant or whether Defendant was "wet or sweaty" from running. Deputy Clark did not recall whether he threatened to arrest Ms. Simmons and call the Department of Children's Services ("DCS") "to come and get the kids." Deputy Clark stated that Defendant "changed his story several times throughout the whole conversation[.]"

LCSD Sergeant Nathan Massey testified that, in the early morning of November 22, 2017, Deputy Jones called him to advise him of a burglary on Hotel Road. On the way to the scene, Sergeant Massey heard over the radio that the deputies were in pursuit of a van that fled the burglary scene. When Sergeant Massey arrived at the victim's house on Hotel Road, he noticed tools on the lawn next to the driveway and a crowbar and a debit card on the front porch. Sergeant Massey noted that the debit card belonged to Justin Shockley. He said that the front door "had been beaten, pried on" and that the screen door "had damage." Sergeant Massey photographed the damage and the tools, and the victim gave him a list of tools taken from her garage, with a total value of $2,700. The victim also estimated the amount of vandalism to total $750.

Sergeant Massey then joined the other deputies at the scene of the van accident, approximately one mile from the victim's house. The van was in a ditch, and the driver's side door was open. Sergeant Massey "ran the tag" of the vehicle and found that Ms. Simmons was the owner of the van. He found a bag in the van containing a drill, drill bits, a tape measure, and other little tools. Sergeant Massey found another bag containing a "plethora" of hand tools. Sergeant Massey showed the contents of the bags to the victim, and she identified them as hers. Also inside the van, Sergeant Massey found a wallet containing Ms. Simmons' identification card, her family's insurance cards, a fuel

card, and a bank card with the name "Sara George." Sergeant Massey explained that Sara George was Defendant's mother. Sergeant Massey photographed the evidence in the van.

Sergeant Massey then went to the home of Justin Shockley to question him about the debit card found at the scene of the burglary. He then returned Deputy Clark's phone call and learned that Ms. Simmons reported her van as stolen. Sergeant Massey went to Ms. Simmons' house but did not believe Ms. Simmons' report of a stolen vehicle. He explained:

> The very first thing struck me funny was that she stated she went to bed at 12:01[. T]hat is not a typical response of someone to know exactly the very minute they went to bed. So we knew at that point she was giving too many details that sometimes leads to deception, so that is why we kind of got wary of what she was saying.

Ms. Simmons gave consent to search the premises, and Sergeant Massey and Deputy Clark located Defendant in a bedroom closet. Sergeant Massey advised Defendant of his *Miranda* rights, which Defendant waived. Defendant said, "[M]y dumb*ss little cousin had me take him out to steal a bunch of sh*t!" Sergeant Massey recalled that Defendant gave several conflicting stories. Defendant admitted that he drove the van past the victim's house when the deputies were present and that he yelled profanities and drove way. Defendant explained to Sergeant Massey that Mr. Shockley tried to "jimmy the door" with the debit card. However, Sergeant Massey testified that the debit card found at the scene was "completely undamaged" and that he believed Defendant left the card there "to set up" Mr. Shockley. Sergeant Massey testified that the scene of the van accident was "a mile or two" from Defendant's residence "as the crow flies."

Sergeant Massey stated that he had no credible evidence that Mr. Shockley was involved in the burglary. Based on Defendant's admissions, the evidence found in the van, Defendant's conduct from fleeing from the area of the victim's house in the van, and his wife's actions, Sergeant Massey arrested Defendant.

On cross-examination, Sergeant Massey said that he used an app on Mr. Shockley's phone to track Mr. Shockley's movements that evening and early morning. He stated that Mr. Shockley told his grandmother that his wallet was missing and that he thought he lost it at Defendant's home. Sergeant Massey did not know whether Defendant's clothes were wet when he arrested Defendant and did not notice whether Defendant was under the influence. He stated that he believed Defendant went from the accident scene to his residence on foot. Sergeant Massey said the accident occurred at

2:35 a.m. and that he arrived at Defendant's home at approximately 5:30 a.m. Sergeant Massey denied that he or Deputy Clark threatened to call DCS "to come and get the kids."

Sara George testified that she was Defendant's mother and that she was living with Ms. Ward next door to the victim on Hotel Road in November 2017. She said that she and Ms. Ward lived between the victim and the Whiteheads. She stated that there were two times that she had to call the authorities on Defendant in the past—once for running away from rehab as a teen and once for hitting the car of his sister's abusive husband. She said that, on the night of November 21, 2017, she heard a van pull up outside. Ms. George heard a door close, but no one came to the door. She opened the front door and saw Mr. Shockley "getting back in the van" in the driver's side; there was no one in the passenger seat. She said that Mr. Shockley grew up with her children and that "you could mistake" Defendant for Mr. Shockley.

On cross-examination, Ms. George testified that she only knew of this one time that Mr. Shockley ever came to her house alone late at night. She said that she did not "flag the van down" to ask why he was there.

Whitney McCowan testified that she knew Defendant because her children played with his. She said that she knew Mr. Shockley but "ha[d] not associated with him in a while." Ms. McCowan stated that, on the evening of November 21, 2017, she went to Defendant's house around 11:00 p.m. to see Ms. Simmons regarding some clothing for Thanksgiving the next day. She said that Mr. Shockley left in Ms. Simmons' van and that she "had to put [her] car in reverse out of the driveway to let him out." Ms. McCowan stated that Defendant was still at his house and that, about twenty minutes later, a neighbor came over and "they went out to the shed to work on his truck."

On cross-examination, Ms. McCowan testified that she was at Defendant's house for two hours and that her mother was watching her children. She stated that she had no idea what happened after 1:00 a.m. on November 22.

The jury convicted Defendant in count one of aggravated burglary; in count two of vandalism valued $1,000 or less; in counts three and four of theft of property valued between $2,500 and $10,000; in count five of evading arrest by motor vehicle; and in count six of evading arrest on foot. The trial court merged count four into count three, merged count six into count five, and sentenced Defendant as a Range III Persistent Offender to an effective twenty-three years' incarceration with a forty-five percent release eligibility, as follows:

| Count | Offense | Sentence |
|---|---|---|
| 1 | aggravated burglary | fifteen years to serve in the Tennessee Department of Correction ("TDOC"), at forty-five percent release eligibility, concurrent with counts two and three and consecutive to count five |
| 2 | vandalism, $1,000 or less | eleven months and twenty-nine days to serve in the county jail, concurrent with counts one and three and consecutive to count five |
| 3 | theft of property, $2,500 to $10,000 | twelve years to serve in the TDOC, at forty-five percent release eligibility, concurrent with counts one and two and consecutive to count five |
| 5 | evading arrest | Eight years to serve in the TDOC, at forty-five percent release eligibility, consecutive to counts one, two, and three |

Defendant now appeals.

## Analysis

Defendant argues that the trial court erred in denying his motion for judgment of acquittal because the evidence was insufficient to sustain his convictions. The State responds that the trial court properly denied the motion because the evidence was sufficient that Defendant was the perpetrator of the crimes. We agree with the State.

Rule 29 of the Tennessee Rules of Criminal Procedure "empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the [S]tate rests or at the conclusion of all the evidence." *State v. James*, 315 S.W.3d 440, 455 (Tenn. 2010) (citing *Overturf v. State*, 571 S.W.2d 837, 839 & n. 2 (Tenn. 1978)). When considering a motion for judgment of acquittal, whether at the close of the State's proof or after the conclusion of all proof at trial, the trial court is only concerned with the legal sufficiency of the evidence and not with the weight of the evidence. *State v. Collier*, 411 S.W.3d 886, 892 (Tenn. 2013). Because "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction[,]" we will review the Defendant's claim as a sufficiency of the evidence challenge. *Finch v. State*, 226 S.W.3d 307, 316-17 (Tenn. 2007); *see also State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As pertinent here, a person commits aggravated burglary who, without the effective consent of the property owner, enters a habitation with the intent to commit a felony, theft, or assault. Tenn. Code Ann. §§ 39-14-403(a), 39-14-402(a)(1) (2017). A person commits vandalism who knowingly "[c]auses damage to or the destruction of any real or personal property of another . . . knowing that the person does not have the owner's effective consent[.]" Tenn. Code Ann. § 39-14-408(b)(1) (2017). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a) (2017). A person evades arrest who, "while operating a motor vehicle on any street, road, alley or highway in this state, . . . intentionally flee[s]or attempt[s] to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop." Tenn. Code Ann. § 39-16-603(b)(1) (2017). Further, a person evades arrest who flees "by any means of locomotion from anyone the person knows to be a law enforcement officer if the person . . . [k]nows the officer is attempting to arrest the person[.]" Tenn. Code Ann. § 39-16-603(a)(1)(A) (2017).

Defendant argues that the evidence was insufficient to prove that he was the perpetrator of the offenses. He does not argue that the charged offenses did not occur. The identity of the perpetrator is "an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." *Id.* (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

- 9 -

Taken in the light most favorable to the State, the evidence was sufficient that Defendant was the perpetrator of the offenses. The victim's front door was pried open, and a crowbar was near the door. The victim's garage door was open, and several tools from her garage were strewn on the lawn. Deputy Jones testified that a man matching Defendant's description approached the scene of the burglary, had words with the deputies who were there, and fled in a van registered to Ms. Simmons. After a pursuit, the van crashed into a ditch. When deputies arrived at the scene of the accident, the driver's door was open, and no one was present. Several tools from the victim's home were found inside the van. After Ms. Simmons lied about his whereabouts, Defendant was found hiding in his bedroom closet, and he subsequently confessed to the offenses. Ms. Simmons admitted to making a false report of a stolen vehicle to "cover" for Defendant. While there was evidence that another person may have been present at the scene of the burglary, the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence." *Rice*, 184 S.W.3d at 662. We conclude that any rational trier of fact could have found that Defendant was the perpetrator of the charged crimes. *Id*.; *Jackson*, 443 U.S. at 319. Defendant is not entitled to relief.

## Conclusion

The judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE